**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | No.    08-328-1 |
| JUAN CORDERO, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | No.    08-328-2 |
| JOSE CARABALLO-RODRIGUEZ | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION AND ORDER**

**RUFE, J.**                                                                                    **September 6, 2011**

At the conclusion of a trial before this Court, a jury found co-defendants Juan Cordero

and Richard Caraballo-Rodriguez guilty of all charges arising out of a conspiracy to import

cocaine into the United States, in violation of 21 U.S.C. §§ 846 & 841(a)(1), and 18 U.S.C. § 2.

The Court now considers Defendant's timely Joint Motion for Judgment of Acquittal

Under Federal Rule of Criminal Procedure 29(c).[1]  Defendants argue that the Government did not

---

[1] Doc. no. 97.  The docket numbers referenced herein correspond to case number 08-cr-328-2.
Following the jury verdict, the Defendants filed a Joint Motion for Judgment of Acquittal, asserting that
the evidence presented at trial was insufficient to support the verdict.  Mr. Cordero also entered a
separate—but largely repetitive—Motion to Grant Judgment of Acquittal Based on Insufficient Evidence
of Culpable Knowledge.  Defendants have submitted separate Memoranda of Law in support of their
joint motion.

present sufficient evidence from which a jury could properly conclude that the defendants knew the specific objective of the unlawful conspiracy.  The Court has reviewed the trial transcripts, the Parties' written submissions, governing case law, and heard oral argument on the pending motions.

## I. Background

Because the evidence presented is crucial to our disposition of the pending Motions, we review it in detail.  At trial, the Government presented four categories of evidence: 1) the testimony of the state police and DEA agents involved in this investigation and drug interdiction; 2) the testimony of co-defendant Luis Deya-Diaz; 3) physical evidence including seized contraband, cellular telephones, and telephone records; and 4) expert testimony about the typical operation of Puerto-Rican drug-trafficking schemes.  The evidence, taken in the light most favorable to the Government, showed the following.

A.   The Events of May 1, 2008

On May 1, 2008, Luis Antonio Deya-Diaz and Richard Caraballo-Rodriguez triggered the suspicion of the San Juan Drug Enforcement Agency ("DEA") by purchasing one-way airline tickets from San Juan to Philadelphia for cash, and by failing to carry-on or check any luggage.[2] The San Juan DEA notified the Philadelphia High Intensity Drug Trafficking Area group ("HIDTA")—a mass transportation drug interdiction unit composed of DEA Agents and state and local law enforcement— about the suspicious passengers.[3]  In turn, HIDTA launched an

---

[2] Tr. 6/30/09, 116–17; Tr. 7/1/09, 5–6.

[3] Tr. 6/30/09, 85 (DEA Special Agent Merit Gibson testified that the group involved in this investigation included his supervisor, Mike Cannon, Special Agent Anthony Jennings, Task Force Officer Timothy King, and "several other people.").

investigation at the Philadelphia International Airport, and positioned surveilling agents at the plane's arrival gate and the luggage carousel.[4]  At trial, the Government submitted the testimony of three DEA Agents and three state police officers who were involved in that day's surveillance and interdiction operation.[5]  The following account is based on those officers' trial testimony.

After Deya-Diaz and Caraballo-Rodriguez deplaned in Philadelphia, they both walked to the baggage claim, although neither had checked any luggage.[6]  Juan Cordero met the men at the luggage carousel, and waited with them until Deya-Diaz collected two large suitcases from the carousel.  While they were waiting, Caraballo-Rodriguez, Deya-Diaz, and Cordero had a brief conversation.[7]  After Deya-Diaz lifted two suitcases off the carousel, he began to walk towards the parking garage with Cordero; Caraballo-Rodriguez collected two additional large suitcases and then followed Deya-Diaz and Cordero to the garage.[8]

When the three men arrived in the parking garage, they met Wilifredo Aquino, who had parked his livery vehicle, a black Suburban SUV with New York tags, next to a minivan.  All three individuals were observed conversing with Aquino.[9]  Deya-Diaz placed his two suitcases into the SUV (no one observed Caraballo-Rodriguez doing so), and then, along with Cordero and

---

[4]  Tr. 6/30/09, 85.

[5]  The Government presented the testimony of three state police officers at trial: Trooper Joseph Francis Thompson, Corporal William J. Burdette, and Trooper Wilfredo Moreno.  Three DEA Agents who were involved with the investigation testified:  DEA Special Agent Merit Gibson, DEA Special Agent Anthony Jennings, and DEA Special Agent Michael Cannon.

[6]  Tr. 6/30/09, 120.

[7] Tr. 6/30/09, 121.

[8]  Tr. 6/30/09 90, 93.

[9] Tr. 6/30/09, 129.

Caraballo-Rodriguez, climbed into the minivan.[10]  With Cordero driving, the three men departed

the airport and proceeded southbound on I-95.  Aquino got into the SUV which contained the

suitcases, exited the garage, and drove northbound on I-95.  As the vehicles left the parking

garage, the surveilling agents alerted interdiction agents stationed outside of the airport to the

make and model of the vehicles.

      Both vehicles were stopped by Pennsylvania State Police troopers.  Aquino was stopped

on the northbound side of I-95 for following another vehicle too closely.[11]  The trooper found all

four suitcases—which were locked—in the back of the SUV, and asked Aquino for permission to

search the luggage.[12]  Aquino consented and the trooper broke the luggage locks and searched

one of the suitcases.[13]  Inside, the trooper found bricks of cocaine, neatly packed "like a puzzle,"

and concealed with towels and packing materials.[14]  A subsequent warrant-authorized search of

all four suitcases revealed approximately 50 kilograms of cocaine.[15]  Each pair of suitcases

contained twenty-five kilograms of cocaine, with 12 kilograms in one and 13 kilograms in the

---

[10] Tr. 6/30/10, 130, 168 (Officer Jennings testified that no officer observed Rodriguez-Caraballo put suitcases into the SUV, but that Deya-Diaz was observed walking to the SUV and placing his luggage inside the back trunk.).

[11] Tr. 6/30/09, 46.

[12] Tr. 6/30/09, 51.

[13] Tr. 6/30/09, 52.

[14] Tr. 6/30/09, 54.

[15] Tr. 6/30/09, 138–140 (An analysis of the substance contained in the luggage confirmed that it was cocaine, with a net weight of 49.10 kilograms and a purity of 76%).

other.[16]  Federal Agents did not find any fingerprints on the bricks of cocaine.[17]

A state trooper stopped Cordero's van on Southbound I-95 after he abruptly swerved between lanes without using the appropriate turn signals, then signaled as if he were going to exit, and then, instead of exiting, veered back onto I-95.[18]  At the Officer's request, Cordero provided his registration and driver's license, which showed that Cordero was the owner of the minivan.  After the officer issued Cordero a written warning, Cordero asked the trooper for directions to I-95 North.  At that point, an officer fluent in Spanish arrived at the scene, and received consent to search the vehicle.  Although no contraband was discovered during the search, the three men were detained for investigation at the direction of the HIDTA team.  Upon detaining the men, the police seized currency in the amount of $456.00 from Deya-Diaz, $33.00 from Caraballo-Rodriguez, and $1,173 from Cordero.[19]  They also seized cellular phones from each individual—Cordero's was missing its SIM card.[20]

All four men were taken to the Pennsylvania State Police Belmont Barracks for processing.  There, two agents interviewed Deya-Diaz.  During the interview, Deya-Diaz stated that he was traveling alone; when asked if he knew anyone else on the flight, he indicated that he had exchanged small talk with Caraballo-Rodriguez in San Juan because they grew up in the

---

[16]  Tr. 6/30/09, 184; Tr. 6/30/09, 73–77.

[17]  Tr. 6/30/09, 172.

[18]  Tr. 6/30/09, 74.

[19]  Tr. 6/30/09, 143, 188.

[20]  Tr. 6/30/09, 142.

same area of San Juan.[21]  Deya-Diaz denied that he was traveling with Caraballo-Rodriguez, and

claimed that they were on the same flight by coincidence.[22]  In addition, Deya-Diaz stated that he

had "no idea" that he and Caraballo-Rodriguez were both meeting Cordero in Philadelphia.[23]

When asked where he was going, he stated that he was going to Juan Cordero's house in either

New Jersey or New York.  When asked about the suitcases, he stated that Cordero instructed him

to pick up the suitcases because they looked like Caraballo-Rodriguez's suitcases.[24]  After the

interview, the agents took Deya-Diaz to a room where Cordero and Caraballo-Rodriguez were

being held and where all the seized evidence, including the suitcases, was being processed.[25]

When Deya-Diaz entered the room and saw the bricks of cocaine, he denied all involvement and

refused to talk to the agents any further.[26]

B.    THE PROSECUTION

On June 5, 2008, a federal grand jury returned an indictment against Juan Cordero, Luis

Deya-Diaz, and Richard Caraballo-Rodriguez, charging them with conspiracy to distribute more

than five kilograms of cocaine in violation of 21 U.S.C. § 846, possession of more than five

kilograms of cocaine with the intent to distribute, and aiding and abetting possession with intent

---

[21] Tr. 6/30/09, 97.  A SIM (Subscriber Identity Module) card stores a cell phone subscriber's identification data, including the phone number.  See U.S. v. Jackson, 364 F. App'x 776, 779 (3d Cir. 2010).

[22] Tr. 6/30/09, 200.

[23] Tr. 6/30/09, 200.

[24] Tr. 6/30/09, 97.

[25] Tr. 6/30/09, 201.

[26] Tr. 6/30/09, 207.

to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C.

§ 2.  In addition to the evidence described above, the Government introduced the testimony of

Deya-Diaz, who had entered into a cooperation-plea agreement with the Government prior to

trial.[27]

###### 1.    Testimony of Luis Deya-Diaz

At trial, Deya-Diaz, testified extensively about both the events leading to his involvement

in the drug-smuggling scheme and the events of May 1, 2008.  Prior to May 1, Deya-Diaz had

repeatedly acted as a courier between Puerto Rico and New York.  Before September 11, 2001,

he made six or seven round-trip journeys between Puerto Rico and New York.  On each journey,

he picked up money in New York, returning with amounts between 200 to 300 thousand dollars

secured to his body.[28]  After September 11th, Deya testified that he took three or four more

journeys, picking up suitcases on arrival at the airport, and returning to Puerto Rico with money

packed in suitcases.[29]  Nobody ever told Deya-Diaz what was in the suitcases.[30]

On April 25, 2008, an unidentified Dominican male, known simply as "Domi," called

Deya-Diaz in Puerto Rico and offered him $5,000 to fly to Philadelphia and pick up two

suitcases.[31]  Domi told Deya-Diaz that someone would recognize him and take him to airport

---

[27] Gov'ts' Suppl. Resp. in Opp'n. to Defs.' Post-Verdict Mots. for J. of Acquittal, Oct. 1, 2009, 2 [doc. no. 121].

[28] Tr. 7/1/09, 14 (Deya-Diaz explained that the money was in ten dollar packs, fastened to his body by the belt around his waist and hidden in his elastic socks.).

[29] Tr. 2/1/09, 16.

[30] Tr. 7/1/09, 16.

[31] Tr. 7/1/09, 12.

parking, where he would hand over the suitcases.[32]  The trip was originally planned for April

26th.  At Domi's request, Deya-Diaz met him on the evening of April 25th.  During the meeting,

Domi gave Deya-Diaz eight-hundred and forty dollars for a one-way ticket to Philadelphia,

showed him two gray suitcases and a skateboard tag that he planned to attach to the suitcases,

and asked Deya-Diaz to describe what he would wear at the airport.  The next day, however,

Domi called Deya-Diaz and told him the trip was rescheduled for May 1st.

On the morning of May 1, Deya-Diaz departed San Juan at 8:00 a.m on a flight bound for

Philadelphia International Airport; upon his arrival, he proceeded, as instructed, to the luggage

carousel.  There, although Cordero had never met Deya-Diaz, Cordero approached Deya-Diaz at

the luggage carousel, greeted him, and waited with him for the luggage to arrive.[33]  Once the

luggage was in hand, they proceeded to the parking garage, where Cordero directed Deya-Diaz to

place the luggage in the trunk of the SUV, and then told him to get into the mini-van.[34]  After

Deya-Diaz entered the van, the back door opened and Caraballo-Rodriguez climbed into the van.

Deya-Diaz acknowledged that he briefly spoke to Caraballo-Rodriguez by the baggage claim, but

claimed that he did not know that Caraballo-Rodriguez was acting as a courier until he got into

the van.[35]

---

[32] Tr. 7/1/09, 12.

[33] Tr. 7/1/09, 36.

[34] 7/1/09, 33–34; Tr. 6/30/09, 130–131.  No officer saw Rodriguez-Caraballo put suitcases into the SUV; however, a DEA Agent observed Deya-Diaz walk to the SUV and place his luggage inside the back trunk.  Tr. 6/30/09, 130, 168.

[35] Tr. 7/1/09, 34.  Although Deya-Diaz admitted that he spoke to Caraballo-Rodriguez at the carousel, he testified that they only spoke because "[m]ost Puerto Ricans when we gather in a place, we talk even if we don't know each other."  Id.

After leaving the airport, Deya-Diaz asked Cordero where they were going and who was going to pay him; Cordero answered that they were going to the Bronx, where Deya-Diaz would receive his money.[36]  Deya-Diaz did not hear Caraballo-Rodriguez ask about payment.[37]  As the men traveled south on I-95, Cordero noticed that a unmarked police cruiser was following the mini-van.[38]  Upon seeing that an unmarked police cruiser was following the minivan, Cordero took measures to elude the police.  In addition to swerving off I-95 onto an exit, and then back onto I-95, Cordero told his passengers to get rid of the SIM cards in their cell phones.[39]  Deya-Diaz saw Cordero remove the card from the back of his phone and throw it out the window, but did not observe whether or not Caraballo-Rodriguez also attempted to remove the card in his phone.[40]

After their arrest, the three men were taken to the police station, where they were seated on the same bench to await processing.  Deya-Diaz testified that while they were waiting, at his initiative, the three men concocted a story to explain why they were in Philadelphia at the same time, which he related to the police in his first statement.[41]  Neither Caraballo-Rodriguez nor Cordero made a statement to any law enforcement officials.

Deya-Diaz admitted that he lied during his first police interview, and stated that he told

---

[36] Tr. 7/1/09, 36

[37] Tr. 7/1/09, 37.

[38] Tr. 7/1/09, 38.

[39] Tr. 7/1/09, 38.

[40] Tr. 7/1/09, 39.

[41] Tr. 7/1/09, 44–45.

the agent that he had come to Philadelphia for a party.  Deya-Diaz did not see inside the suitcases

until he returned to the holding room after his interview; he was not given a key for the padlock

to the suitcases, and never attempted to open the suitcases during the brief time he possessed

them.[42]  However, Deya-Diaz testified that although no one told him that the suitcases contained

cocaine, he knew, based on his past experiences of serving as a courier, the substantial payment

that he was promised, the heavy weight of the suitcases, and "common sense" that they contained

drugs.[43]

     *2.    Physical Evidence*

     The cell phone records for each of the cell phones recovered from the defendants at arrest

were produced at trial, and were the subject of testimony by Deya-Diaz and the DEA Agents.

Those records established that both Deya-Diaz and Caraballo-Rodriguez had been in contact with

the same telephone number in Puerto Rico within 15 minutes of one another the morning of the

May 1st flight.  Deya-Diaz testified that the call was from his recruiter, who confirmed that the

bags were in place and that the trip was a "go."[44]  The phone records also showed that both Deya-

Diaz and Caraballo-Rodriguez had prior contacts with that same phone number on similar dates a

week before the flight.  Deya-Diaz testified that the prior calls surrounded the planning and

cancellation of the April 26th flight.[45]

     Special Agent Jennings testified that together, all three phones "hit off over twenty DEA

---

[42]  Tr. 7/1/09, 157.

[43]  Tr. 7/1/09, 16–17, 155.

[44]  Tr. 7/1/09, 26, 60–61, 151.

[45]  Tr. 7/1/09, 151–52.

cases," meaning that the numbers were found in a FBI database in connection with twenty other narcotics investigations.[46]  In addition, Special Agent Cannon testified that Cordero received two incoming calls originating from the Bronx forty minutes after the arrival of the plane, and again at 12:54.[47]

   *3.  Expert Testimony*

   The Government offered expert testimony from DEA Special Agent Alan Basewitz in order to explain the *modus operandi* of drug traffickers.[48]  According to Basewitz, certain patterns characterize airport-drug-smuggling schemes and may trigger DEA surveillance.[49]  First, drug traffickers typically use cash to purchase last-minute, one-way airport fares at exorbitantly high rates.[50]  Although such a purchase by itself does not immediately prompt suspicion, the location of the originating flight is another indication of a drug smuggling scheme.  Certain cities have unusually high volumes of cocaine exportation and are categorized as "source cities"—for instance, San Juan, Puerto Rico is a "source city" that supplies cocaine to the northeastern United States.[51]  The absence of any checked bags is a final indicator that may lead the DEA to launch a drug interdiction.

   During a DEA airport interdiction, agents observe the suspects as they deplane from their

---

   [46] Tr. 6/30/09, 181–83.

   [47] Tr. 7/1/09.

   [48] Tr. 7/2/09, 93.  Basewitz's testimony was based on twelve years of experience in the interdiction field.

   [49] Tr. 7/2/09, 98–99.

   [50] Tr. 7/2/09, 99.

   [51] Tr. 7/2/09, 100.

flight to determine if they might be acting as "couriers."  If a suspected courier—who often boards without checking any luggage—proceeds to the baggage claim, the agents watch to see if they are met by an "observer."  "Observers" or "monitors" are "sent to insure that the police haven't interceded, that the person is doing what they're supposed to do and not, for instance, taking the drugs for themselves."[52]  In addition, "observers" are often responsible for directing the couriers and sending them to the next "phase."[53]  The suitcases retrieved from the baggage carousel are further "indicators" that a drug transaction is afoot.  They are typically new bags, tagged with an "identifier" to distinguish the baggage from other luggage.[54]

Couriers are responsible for transporting drugs or money from one location to another,[55] and are typically recruited by "being offered a considerable amount of money for very little effort."[56]  According to Basewitz,

> [C]ouriers . . . are not picked out of the blue, in most instances . . . . They are trusted individuals.  The couriers, if you're transporting a significant amount, their addresses or families and information are known to the person who is either coordinating or supplying.  The inverse is not true in most instances.  And they have to be trusted because of the amounts that they ferry back and forth, both if it's cash, depending on which direction you're heading, or if it's drugs. . . .

> Quite often through my proffers and interviews and intelligence information through conversations with informants and cooperators and other law enforcement and most through my personal interactions with these individuals, they know it's drugs.  They may not know the type, depending on the group.  They may not know the weight.

---

[52] Tr. 7/2/09, 102.

[53] Tr. 7/2/09, 101–02.

[54] Tr. 7/2/09, 114.

[55] Tr. 7/2/09, 101.

[56] Tr. 7/2/09, 106.

But, they know or should have known that it's drugs.[57]

Basewitz also explained that:

> There is an exception to that, when there is what's known as the blind mule. But, the blind mule only occurs, in my expertise and experience, in situations that's [sic] dissimilar from those that are present today . . . .
>
> A blind mule is where a defense is put forth wherein somebody unwittingly is carrying drugs. They don't know that they're carrying drugs. And they're almost set up to do this. [T]he blind mule would occur when, for instance, you're traveling with somebody that is known to you or you're traveling with somebody that is known to you or you're renting---or somebody is using---you're going on a trip in a car, and the person is known to you, and the dealer is trying to hide the drugs.
>
> So, they might slip it into your bag. They might slip it into the floorboard of the car, into the air conditioning vent, in the glove compartment in some instances, sometimes removing the door frame of the car and putting it in.
>
> But, the difference in those situations are, it's a smaller amount, it's a person known to you so if somebody says -- a relative or a cousin or a friend -- can you carry this bag, it's -- you know, I have two bags, and the airline is going to charge me for an additional bag, can you take this.[58]

According to Basewitz, this type of scheme is "a pyramid scheme of disposable people,"in which couriers might know that organization traffics drugs, but "are not given the information of the hierarchy because it would be easy for them to rat them out."[59]

## II. STANDARD OF REVIEW

On a Rule 29(c) motion, the district court must view the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have

---

[57] Tr. 7/2/09, 107–108.

[58] Tr. 7/2/09, 108–109.

[59] Tr. 7/2/09, 128.

found proof of guilt beyond a reasonable doubt based on the evidence presented at trial.[60]  In

conducting the sufficiency inquiry, a court does "not view the government's evidence in

isolation, but rather, in conjunction and as a whole," and will draw all reasonable inferences in

favor of the decision of the jury.[61]  Therefore, the Court  must sustain the jury's verdict if there is

*substantial evidence* to uphold their decision;[62] "[t]he fact that alternative inferences exist is

irrelevant."[63]  Under this particularly deferential standard of review, the Court "must be ever

vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the

evidence, or by substituting [the Court's] judgment for that of the jury."[64]  Accordingly, a finding

of insufficiency should be "confined to cases where the prosecution's failure is clear."[65]

Notwithstanding this highly deferential standard, in a conspiracy case the Court must

"closely scrutinize the Government's evidence because (1) slight evidence of [the Defendants']

connection to the conspiracy is not sufficient to support guilt, and (2) guilt must remain

individual and personal."[66]  "Conspiracy cannot be proven 'by piling inference upon inference'"

---

[60] United States v. Boria, 592 F.3d 476, 480 (3d Cir. 2010); see also United States v. Cunningham, 517 F.3d 175, 177 (3d Cir. 2008); United States v. Smith, 294 F.3d 473, 476 (3d Cir. 2002).

[61] United States v. Brodie, 403 F.3d 123, 134 (3d Cir. 2005); see also United States v. United States Gypsum Co., 600 F.2d 414, 417 (3d Cir. 1979) ("The character and effect of a conspiracy (is) not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.") (internal citation & quotations omitted) cert denied 444 U.S. 884 (1979).

[62] United States v. Flores, 454 F.3d 149, 154 (3d Cir. 2006) cert. denied 549 U.S. 1046 (2006).

[63] Boria, 592 F.3d at 486 (Fisher, J., concurring) (citing United States v. Iafelice, 978 F.2d 92, 97 n.3 (3d Cir. 1992).

[64] Brodie, 403 F.3d at 132.

[65] Smith, 294 F.3d at 477.

[66] Boria, 582 F.3d at 480.

14

where those inferences do not logically support the ultimate finding of guilt.[67]

## III. Discussion

The Government argues that the totality of evidence presented at trial was sufficient to enable the jury to find beyond a reasonable doubt that Defendants knew—or were aware to a high probability—that they were transporting a controlled substance.[68]  Defendants contend that their case falls within a line of Third Circuit precedent finding that the Government failed to offer evidence from which a rational trier of fact could logically infer that the defendants knew that a controlled substance, as opposed to other illegal contraband, was involved in the transaction at issue.[69]

### A.   Elements of Conspiracy

To prove conspiracy, the Government must show that there was "an agreement, either explicit or implicit, to commit an unlawful act, combined with intent to commit the underlying offense."[70]  The alleged conspirators must share a "unity of purpose," the intent to achieve a common illegal goal, and an agreement to work together towards that goal.[71]  Together, these

---

[67] United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987).

[68] Gov't's Supp. Resp. in Opp'n. to Defs.' Post-Verdict Mots. for J. of Acq. at 3 [doc no. 121] (10/1/09).

[69] Defs.' Joint Mot. for J. of Acq. at 1–2 [doc. no. 97].

[70] Brodie, 403 F.3d at 134 (citation & quotations omitted).

[71] Boria, 592 F.3d at 481; United States v. Mastrangelo, 172 F.3d 288, 291 (3d Cir. 1999); United States v. Schramm, 75 F.3d 156, 163 (3d Cir. 1996) (illegality is an essential element); United States v. Kates, 508 F.2d 308, 311 (3d Cir. 1975) (there must be evidence that the defendant "knowingly entered into a conspiracy").

elements "incorporate a requirement that [the Defendants] had knowledge of the *specific illegal objective* contemplated by the particular conspiracy."[72]  The Government must establish these elements beyond a reasonable doubt.

Because "[s]ecrecy and concealment are essential features of successful conspiracy,"[73] the Government may satisfy its burden to prove each of these elements beyond a reasonable doubt through either direct or circumstantial evidence.[74]  But any inferences drawn must "have a logical and convincing connection to the facts established;"[75] the Third Circuit "forbids the upholding of a conviction of the basis of speculation."[76]

Because the Court, at the Government's request, instructed the jury that the Defendants could be found to have joined the conspiracy if the Government proved beyond a reasonable doubt that they deliberately ignored the high probability that they were participating in a drug conspiracy and that their participation furthered the conspiracy's aims, the jury verdict must stand if the Government's evidence supports a finding of willful blindness.[77]  "Willful blindness is not to be equated with negligence or a lack of due care;" the jury may not convict the defendant if the evidence simply shows that he should have "known of facts of which he or she

---

[72] See, e.g., Boria, 592 F.3d at 481 (emphasis added); United States v. Cartwright, 359 F.3d 281, 287 (3d Cir. 2004); United States v. Idowu, 157 F.3d 265, 267 (3d Cir. 1998); United States v. Thomas, 114 F.3d 403, 405 (3d Cir. 1997).

[73] Blumenthal v. United States, 332 U.S. 539, 557 (1947).

[74] Brodie, 403 F.3d at 134.

[75] Cartwright, 359 F.3d at 288.

[76] Thomas, 114 F.3d at 406;.

[77] United States v. Wert-Ruiz, 228 F.3d 250, 254–55 (3d Cir. 2000).

16

was unaware."[78]

B.   AIDING AND ABETTING

Defendants were also convicted of aiding and abetting possession with intent to distribute a controlled substance.  In order to prove that charge, the Government is required to prove that Defendants (1) had knowledge of drugs, (2) had knowledge that others intended to distribute drugs, or (3) purposefully intended to aid others in the specific crimes alleged.[79]  Because the mental state required for this charge is identical to that required for conspiracy, the issue of whether the Government sufficiently provided evidence of "knowledge" is dispositive to both charges.[80]

C.   THE THIRD CIRCUIT'S STRICT APPROACH TO SUFFICIENCY

To sustain a conviction for conspiracy with intent to distribute a controlled substance, the Third Circuit has "consistently required the Government to introduce drug-related evidence, considered with the surrounding circumstances, from which a rational trier of fact could logically

---

[78] Id. at 255.

[79] See Boria, 592 F.3d at 481 n.8.; United States v. Salmon, 944 F.2d 1106, 1113 (3d Cir. 1991) ("An aiding-and-abetting conviction requires that another committed the substantive offense and that the one charged with aiding and abetting knew of the substantive-offense commission and acted with the intent to facilitate it."); Cartwright, 359 F.3d at 287.

[80] See, e.g., Salmon, 944 F.2d at 1113 (acting with intent to facilitate the substantive offense requires that one acted with the "'intent to help those involved with a *certain* crime"); United States v. Wexler, 838 F.2d 88, 92 (3d Cir. 1988) ("It follows that the aiding and abetting conviction must fall for parallel reasons.  The crime of aiding and abetting requires a showing of intent to help those who are involved in a certain crime.  Because the government did not prove that Wexler had knowledge of the [drugs], had knowledge that [his co-defendant] intended to distribute or possess [drugs], or purposefully intended to aid others in committing the crime alleged, a reasonable jury also could not have had sufficient evidence from which to find that Wexler purposefully aided and abetted the possession and/or distribution of [drugs]."); Cartwright, 359 F.3d at 287 ("[A conviction on [an aiding-and-abetting] charge "requires that another committed the substantive offense and that the one charged with aiding and abetting knew of the substantive-offense commission and acted with the intent to facilitate it.").

infer that the defendant knew a controlled substance was involved in the transaction at issue."[81]

Under this "strict approach to sufficiency in drug conspiracy cases," drug conspiracy convictions

cannot be upheld unless the Government introduces evidence "from which the jury could infer

knowledge of drugs, as opposed to some other contraband."  Suspicious circumstances alone are

insufficient to support such an inference; additional evidence must link the defendant to the

specific object of the conspiracy charged.[82]  Therefore, conduct sufficient to support an inference

that the defendant is involved in criminal activity is—without more—insufficient to prove

membership in a narcotics conspiracy.

The Third Circuit has repeatedly overturned drug conspiracy convictions where the

prosecution did not prove the defendant's knowledge of the conspiracy's illegal objective.  In

those cases, the relevant criminal behavior of the defendants varied—ranging from acting as

lookouts[83] or drivers[84] to participating as "trusted member[s]" of the conspiracy[85]—but failed to

establish that the defendant knew that narcotics were the object of the conspiracy.  Unlike cases

where the evidence was sufficient to support an inference of knowledge, in these cases, "despite

the presence of otherwise suspicious circumstances," the Government failed to present "some

---

[81] Boria, 592 F.3d at 481 (gathering cases).  As noted in Boria, "[n]ot all courts of appeals adhere to [the Third Circuit's] strict approach to sufficiency in drug conspiracy cases."  Id. at 481 n.9 (comparing the approaches of the Sixth, Fifth, Tenth, and Seventh Circuits with the approaches of the Second, Third, and D.C. Circuits).

[82] Id. at 482.

[83] Wexler, 838 F.2d at 89; Cartwright, 359 F.3d at 285.

[84] Idowu, 157 F.3d at 268; Salmon, 944 F.2d at 1112; Wexler, 838 F.2d at 89.

[85] Idowu, 157F.3d at 271.

additional piece of evidence imputing knowledge of drugs to the defendant."[86]

For instance, in United States v. Wexler,[87] the Third Circuit reversed the conviction of the defendant for conspiracy and for aiding and abetting the distribution of marijuana.[88] There, "ample circumstantial evidence" showed that the defendant—the apparent "lookout" during an attempt to import 750 pounds of marijuana—was involved in a conspiracy with his co-defendants[89]. Despite this, the evidence was insufficient to show that the defendant knew the object of that conspiracy was to import narcotics. Specifically, there "[was] no evidence that [the defendant] was told there were drugs in the truck, there [was] no evidence of the subject of [the defendant's] conversations with [his co-conspirator], and no evidence that the defendant . . . ever had a prior relationship with [his co-conspirators]."[90] Although the court conceded that "it [was] more likely than not that [the defendant] suspected, if not actually knew, that some form of contraband was involved," the court rejected the Government's argument that because Wexler's position as a lookout demonstrated that he held a position of trust within the conspiracy, he was likely to know the specific illegal object of the conspiracy.[91]

---

[86] Boria, 592 F.3d at 482.

[87] 838 F.2d 88, 92 (3d Cir. 1988).

[88] Id. at 90.

[89] Id. at 91.

[90] Id.; See also Cartwright, 359 F.3d at 287 (analyzing similar facts to conclude that "the absence of any evidence indicating the substance of the conversation with [his co-conspirator], any evidence of a prior relationship with Jackson, or any other direct evidence indicating [the defendant's] knowledge, the jury could only speculate as to [the defendant's] knowledge").

[91] Wexler, 838 F.2d at 91–92.

Later, in <u>United States v. Salmon</u>,[92] the Third Circuit again evaluated the sufficiency of evidence supporting the conspiracy convictions of three defendants involved in a drug sale. The court upheld the conviction of two defendants, but reversed the conviction of Fitzpatrick, a third defendant.[93] There, evidence that Fitzpatrick opened the trunk of his car during the drug deal, allowing the leader of the drug conspiracy to access it before the drug exchange occurred was insufficient to support an inference that Fitzpatrick knew cocaine was the object of the transaction. There was no evidence that cocaine was in the trunk at all, and even if it were, there was no evidence that Fitzpatrick knew it was there.[94] In so holding, the <u>Salmon</u> court emphasized "there must be a logical and convincing connection between facts established and the conclusion inferred."[95]

Similarly, in <u>United States v. Thomas</u>,[96] the Court reversed a conviction for conspiracy to possess cocaine with intent to distribute because the Government had not proven that the defendant knew he was involved in a drug transaction.[97] As part of a drug sting, a cooperating drug courier had been instructed by a member of a conspiracy to leave a suitcase with cocaine in a hotel room and to leave the room key at the front desk in an envelope under a particular name.[98]

---

[92] 944 F.2d 1106 (3d Cir. 1991).

[93] <u>Id.</u> at 1114.

[94] <u>Id.</u> at 1114–15.

[95] <u>Id.</u> at 1114 (emphasis omitted).

[96] 114 F.3d 403 (3d Cir. 1997).

[97] <u>Id.</u> at 405.

[98] <u>Id.</u> at 404.

The defendant later appeared at the front desk, asked for the envelope by name, went to the room, and retrieved the suitcase, at which time he was arrested.[99]  At trial, the defendant admitted that he had been paid $500.00 to pick up the suitcase by a man he did not know, but testified that he had not known what was in the suitcase and was not part of a drug conspiracy.[100]

There, the only evidence the Government presented to show the defendant's knowledge that he was participating in a drug conspiracy was a record showing several phone calls between the defendant's phone and the phones of other members of the conspiracy.[101]  Those records, the court held, were probably insufficient to support an inference that the defendant actually spoke to the co-defendant, and certainly could not support an inference that the substance of those conversations concerned drugs.[102]  Noting that "[t]here can be no doubt that, when [the defendant] pursued his errand . . . he knew that he was somehow involved in an illicit activity" and had "entered into some kind of agreement," the Thomas court concluded that the evidence did not show he knew "the purpose of the agreement was the specific unlawful purpose charged in the indictment, *i.e.* the possession of a controlled substance with intent to distribute."[103]

In United States v. Idowu,[104] a divided Third Circuit panel reversed a defendant's

---

[99] Id.

[100] Id.

[101] Id. at 406.

[102] Id. ("Even assuming that it is permissible to infer from the evidence that [defendant spoke to his co-conspirator], *which is doubtful*, there was no evidence concerning the substance of the phone calls.") (emphasis added).

[103] Id.

[104] 157 F.3d 265 (3d Cir. 1998).  Notably, the holding of Idowu stands in tension with United States v. Boria, the most recent Third Circuit decision in this line of cases, which is discussed, supra.

conviction for conspiracy to possess drugs because the Government failed to prove specific

intent.[105]  There:

> [A] man named Ajao negotiated to buy two kilograms of heroin from a DEA informant. Ajao arrived at the transaction in a Lincoln Town Car driven by Idowu, whom Ajao introduced as the "driver."  Ajao then spoke to the informant in Idowu's presence, but made no reference to "heroin."  Idowu opened the trunk of the car, removed a leather bag from the trunk, and opened it to show the informant approximately $20,000 in cash, assuring him that all the money was there. . . .  Idowu opened the suitcase and, after noticing it was empty, told Ajao that '[t]hey didn't pack this thing.'  Ajao told Idowu to feel along the inside of the suitcase, and the informant assured Ajao and Idowu the heroin was concealed in the lining of the suitcase."[106]

Despite clear evidence that the defendant knew he was involved in an illegal transaction, the

Court held that "the jury could not draw a permissible inference that Idowu had knowledge of the

nature of the deal."[107]  Moreover, Idowu's status as a "trusted member" of the conspiracy, and the

fact that his own car contained the cash, were insufficient to demonstrate knowledge.[108]

In United States v. Cartwright,[109] a cooperating drug dealer set up a transaction with one

_____

There, the concurring opinion argued that "the outcome of [Boria] conflicts with the spirit of our prior decision in Idowu."  Boria, 592 F.3d at 487 (Fisher, J.).  The concurrence correctly observed that "the Government's case against the Idowu defendant was altogether stronger than the Government's case against Boria here."  The majority opinion, however, distinguished Idowu on the basis that there were no co-conspirator statements that implicated the defendant in that case.  Boria , 592 F.3d at 484.

[105] Boria, 592 F.3d at 485 (summarizing Idowu, 157 F.3d at 266–68).

[106] Id.

[107] Idowu, 157 F.3d at 270.

[108]  Judge Stapleton, dissenting, argued that "based on [a] common sense approach to the evidence," the jury could have properly inferred that Idwou was guilty as charged.  Id. at 271.  Because Idowu was tacitly assigned the task of checking the informant's suitcase ( an assignment which would not have been made unless he knew what he was looking for), and in light of the surrounding circumstances, the dissent concluded that the Government has presented sufficient evidentiary support to uphold the conviction.  Id.

[109] 359 F.3d 281 (3d Cir. 2004).

of the defendant Cartwright's co-conspirators.[110]  After initially meeting with the cooperating

drug-dealer, the co-conspirator left to retrieve the drugs.[111]  When he returned, he was briefly

accompanied by Cartwright as he walked through a mall breeze way.  When they separated,

Cartwright appeared to assume a "lookout" position, looking towards the vehicle where the drug

transaction was supposed to occur.[112]  Upon Cartwright's arrest, the police recovered a gun, a cell

phone, a two-way text messaging device, and cash.  Although the evidence supported the

inference that Cartwright served as a lookout, a divided panel concluded that merely acting as a

lookout did not establish knowledge of drugs.  The panel noted there was no evidence of a prior

relationship between the co-conspirator and the defendant, and no evidence of the subject matter

of communications between the co-conspirator and the defendant.[113]

The Third Circuit has also described the "truly distinguishing facts"[114] that may justify an

inference that the defendant knew that drugs were the object of the conspiracy.  In United States

v. Boria,[115] an informant received a tip that several individuals were searching for a place to

unload a tractor-trailer carrying one hundred kilograms of cocaine hidden in boxes buried in the

middle of pallets of rotten fruit.[116]  After working with the smugglers to help find a location to

---

[110] Cartwright, 359 F.3d at 287.

[111] Id. at 284.

[112] Id.

[113] Id. at 291.

[114] Iafelice, 978 F.2d at 97.

[115] 592 F.3d 476 (3d Cir. 2010).

[116] Id. at 478.

unload the truck, the informant received a phone call from the leader of the operation, who informed him that the defendant "was supposed to take the tractor-trailer from [the informant] and take it to a garage to unload the drugs that were in the back of the tractor trailer."[117]  Later, DEA Agents observed the defendant climb into the passenger side of the truck while talking on his cell phone.[118]  Although there was no evidence about the substance of the conversations, phone records showed that all nine of the outgoing calls and five of the incoming calls that occurred during the transaction were to an individual who, according to the informant's testimony, "supplie[d] people with drugs."[119]

After methodically considering United States v. Cooper,[120] Wexler, Salmon, Thomas, and Idowu, the Boria court concluded that Boria's case was distinguishable because none of those cases "included co-conspirator statements implicating the defendant."[121]  In Boria, the informant's testimony supported an inference that the defendant knew that the tractor-trailer contained drugs.  Noting that "[t]he cases in which we declined to find sufficient evidence did not include such evidence," the Boria court concluded that the informant's evidence was

---

[117] Id. at 479.

[118] Id.

[119] Id. at 479 n.5.

[120] In Cooper, the Third Circuit found the evidence insufficient because the defendant merely rode in a truck with marijuana locked in the rear compartment and there was no evidence that he had access to the rear compartment.  In addition, the Government did not introduce any evidence of the subject matter of, or participants in, several phone calls to the defendant's home.  See Cooper, 567 F. 2d at 254–55.

[121] See Boria, 592 F.3d at 484.

"decisive."[122]   The court explained that:

> [N]one of [the] cases [where the evidence was found insufficient] included co-conspirator statements implicating the defendant.   And although <u>Wexler</u> acknowledged co-conspirator statements, none of the statements were made to or about <u>Wexler</u>.   In other cases, there was no evidence of the participants in or the subject matter of co-conspirator conversations.[123]

Similarly, in <u>United States v. Reyeros</u>,[124] a co-conspirator's testimony about the defendant's role and statements were "sufficient to allow a rational juror to conclude beyond a reasonable doubt" that the defendant knew the object of the conspiracy was to import narcotics.[125]   There, the conspirator testified that his "boss," Juan, told him that his brother Jorge (the defendant) was a customs inspector who would facilitate the import of cocaine, but only if the shipment was large enough to justify the risk to his career.[126]   The Court emphasized Juan's relationship with Jorge, explaining that "a jury could reasonably infer that Jorge would ask his own brother . . . , the nature of the contraband for which he was putting his Customs career at risk."[127]   In other cases, the Third Circuit has similarly emphasized the evidentiary significance of ongoing relationships between conspirators.[128]

---

[122] <u>Id.</u> at 485.

[123] <u>Id.</u> at 484 (noting that in <u>Idowu</u>, the co-conspirator never mentioned Idowu by name, and that in <u>Cartwright</u>, <u>Salmon</u>, and <u>Thomas</u>, there was no evidence of the subject-matter of conversations).

[124] 537 F.3d 270 (3d Cir. 2008) <u>cert denied</u> 129 S. Ct. 2780 (2009).

[125] <u>Id.</u> at 279.

[126] <u>Id.</u>

[127] <u>Reyeros</u>, 537 F.3d at 279 n.12.

[128] <u>See</u> <u>United States v. Mercado</u>, 610 F.3d 841, 849 (3d Cir. 2010) ("We hold that a defendant's presence on multiple occasions during critical moments of drug transactions may, when considered in light of the totality of the circumstances, support an inference of the defendant's participation in the criminal activity."); <u>United States v. Powell</u>, 113 F.3d 464, 467 (3d Cir. 1997) (holding that there was

Although the Third Circuit has emphasized the role of co-conspirator testimony, other factors, such as ownership and control, may also support an inference of specific knowledge. For instance, in United States v. Iafelice,[129] the defendant was observed driving his own car to the parking lot of a hotel where the DEA had arranged for a controlled purchase of heroin. He was accompanied by two conspirators, and a bag containing a half-kilogram of heroin was located in the trunk.[130] DEA agents observed the defendant driving in a suspicious manner, and although he remained in the car after the drugs were removed by his co-conspirators, the evidence indicated that he used a beeper and cell phone to communicate with his co-conspirators throughout the transaction.[131]

The Iafelice court overturned the lower court's ruling—which relied on Salmon and Wexler—because the lower court failed to properly account for the "(1) presence and use of a beeper and telephone during the drug transaction; and (2) the undisputed presence of the drugs in

---

substantial evidence to affirm defendant's conviction for conspiracy to distribute cocaine, including that his brother and co-conspirator consulted him as to the sales price; they lived together, shared packaging supplies, and supplied each other with cocaine to sell; and the defendant admitted to distributing cocaine on a daily basis); United States v. Leon, 739 F.2d 885, 892–93 (3d Cir. 1984) (affirming an aiding and abetting conviction where the evidence established that the defendant's *repeated* presence at and proximity to the location where a large quantity of drugs was being unloaded); United States v. Thomas, 379 F. App'x 262, 266 (3d Cir. 2010) (affirming the district court's denial of defendant's motion for judgment of acquittal of his conviction for conspiracy to smuggle drugs, where the defendant on multiple occasions delivered to his co-conspirator a suitcase filled with cocaine as well as cash, and alerted his co-conspirator when the cocaine arrived at its destination); see also United States v. Nesser, 939 F. Supp. 417, 420–21 (W.D. Pa. 1996) (sufficient evidence to show attorney defendant was willfully blind to his participation in a drug and money-laundering operation where he had "years of association" with his client/co-conspirator).

[129] 978 F.2d 92 (3d Cir. 1992).

[130] Id. at 94.

[131] Id. at 94–95.

[the defendant's] car."[132]   The court concluded that because "[c]ommon sense counsels that an

owner and operator of a vehicle . . . usually knows what is in that vehicle," the evidence was

sufficient to establish knowledge.[133]

C.  WILLFUL BLINDNESS

In this case, the Court instructed the jury that it could find knowledge if the evidence

showed that either Cordero or Caraballo-Rodriguez were willfully blind to the object of the

conspiracy."[134]   Willful blindness "is a subjective state of mind that is deemed to satisfy a

scienter requirement of knowledge," and is not to be equated with negligence or a lack of due

---

[132] Id. at 96.

[133] Id. at 97.

[134] The Court's willful blindness instruction stated, in pertinent part:

In this case, there is a question whether Juan Cordero and/or Richard Caraballo-Rodriguez knew that the luggage in question contained cocaine.  When, as in this case, knowledge of a particular fact or circumstance is an essential part of the offense charged, the government may prove that Juan Cordero and/or Richard Caraballo-Rodriguez deliberately closed his eyes to what would otherwise have been obvious to him.

No one can avoid responsibility for a crime by deliberately ignoring what is obvious.  Thus, you may find that Juan Cordero and/or Richard Caraballo-Rodriguez knew that the luggage in question contained cocaine based on evidence which proves that: (1) Juan Cordero and/or Richard Caraballo-Rodriguez consciously and deliberately tried to avoid learning about this circumstance.

You may not find that Juan Cordero and/or Richard Caraballo-Rodriguez knew that the luggage in question contained cocaine if you find that the defendant actually believed that this circumstance did not exist.  Also, you may not find that Juan Cordero and/or Richard Caraballo-Rodriguez knew that the luggage in question contained cocaine if you find only that Juan Cordero and/or Richard Caraballo-Rodriguez should have known of the circumstance or that a reasonable person would have known of a high probability of the circumstance.  It is not enough that Juan Cordero and/or Richard Caraballo-Rodriguez may have been stupid or foolish, or may have acted out of inadvertence or accident.  You must find that Juan Cordero and/or Richard Caraballo-Rodriguez were actually aware of a high probability of the fact that the luggage in question contained cocaine, deliberately avoided learning about it, and did not actually believe that it did not exist.

care.[135]  A willful blindness instruction is often described as sounding in "deliberate

ignorance."[136]  To show willful blindness, the evidence must support an inference that "the

defendant was . . . subjectively aware of the high probability of the fact in question, and not

merely that a reasonable man would have been aware of the probability."[137]

 For instance, in United States v. Wert-Ruiz,[138] a money-laundering case, the evidence was

sufficient to support an inference of willful blindness.[139]  There, co-conspirator testimony

established that the defendant (1) engaged in a practice of using code words, (2) repeatedly

received large amounts of cash in gym bags and (3) that she had the opportunity to ask, but failed

to inquire further into the nature of the scheme.[140]

 In two cases—one precedential and the other not—the Third Circuit has considered the

sufficiency of the evidence to show willful blindness in similar circumstances.  First, in United

States v. Caminos,[141] a 1985 case decided prior to Wexler and its progeny, an inference of

deliberate ignorance was supported by the facts where the "defendant was approached by two

individuals who were willing to pay over $1,000 to ensure that a $60 wood carving was delivered

---

[135] Wert-Ruiz, 228 F.3d at 256.

[136] See United States v. One 1973 Rolls Royce, 43 F.3d 794, 807–08 (3d Cir. 1994).

[137] United States v. Caminos, 770 F.2d 361, 365 (3d Cir. 1985).

[138] 228 F.3d 250, 256 (3d Cir. 2000).

[139] See also United States v. Smith, 183 F. App'x 264, 269 (3d Cir. 2006) (non-precedential) (evidence sufficient to show willful blindness and distinguishing Cartwright, Idowu, and Thomas on grounds that defendant had a longstanding relationship with a known drug dealer and his co-conspirators, knew the object of that conspiracy was to distribute drugs, and maintained an ongoing involvement with the conspiracy).

[140] Wert-Ruiz, 228 F.3d at 258.

[141] 770 F.2d 361, 366 (3d Cir. 1985).

to Pittsburgh."  The Caminos court held that "the disproportionate amount of money expended to deliver the wood carving was sufficient to allow the jury to determine that defendant deliberately ignored the probability that something other than a $60 wood carving was involved.[142]  In Idowu, however, the court seemed to reject a similar argument, noting that while the defendant "may have known that the object of the sale was small enough to be placed in a suitcase, a wide variety of contraband items can fit into a container of that size, including jewelry, laundered money, stolen computer chips, and counterfeiting plates."[143]

In United States v Rodriguez-Valdez,[144] a Third Circuit panel held that the evidence was insufficient to support an inference of willful blindness.[145]  There, after the United States Coast Guard seized a boat laden with 498.5 kilograms of cocaine, they also stopped a nearby boat and arrested its passengers.[146]  At trial, although a co-conspirator testified that the defendant was a "constant help," he did not testify that he discussed drugs with the defendant or otherwise implicate him in the transaction.[147]  After examining the evidence, the court found that "given [defendant's] limited role in this transaction, we find that a reasonable jury could not have found that he so deliberately ignored the truth as to satisfy the knowledge requirement."[148]

---

[142] Id.

[143] Idowu, 157 F.3d at 238.

[144] 209 F. App'x 178 (3d Cir. 2006).

[145] Id. at 180.

[146] Id.

[147] Id. at 179–80.

[148] Id. at 181.

With this jurisprudential background in mind, we turn to the case at hand.

## IV. APPLICATION

As illustrated by the foregoing discussion, the Third Circuit has repeatedly emphasized that a drug-conspiracy conviction will not stand if the Government fails to present evidence from which a juror could logically infer the defendant's knowledge.  From this line of cases, it is possible to draw three rules:  (1) evidence that a defendant is a trusted member of a conspiracy does not—without more—permit an inference of knowledge; (2) evidence of telephone contacts, without evidence regarding the substance of the calls, does not support an inference of knowledge;[149] and (3) where co-conspirator statements directly impute knowledge to the defendant, an inference of knowledge is permissible.

We apply the Third Circuit's guiding principles to the evidence in this case, taken in the light most favorable to the Government, to determine whether the jury should have been permitted to infer that Caraballo-Rodriguez and Cordero knew—or were willfully blind—to the fact that they were participating in a conspiracy to distribute drugs.

A.   CARABALLO-RODRIGUEZ

### 1.    Co-Conspirator Testimony

The Government argues that, as in <u>Boria</u>, the jury could infer from co-conspirator Deya-Diaz's testimony that Caraballo-Rodriguez knew the suitcases contained drugs.  But a close examination of the record reveals that Deya-Diaz's testimony provided no information as to what

---

[149] <u>See also</u> <u>Mercado</u>, 610 F.3d at 846 ("<u>Thomas</u> . . . narrowly prohibits jurors from inferring that a defendant gained knowledge of the subject of an illegal conspiracy based on the existence of a call.").

Caraballo-Rodriguez knew.  Although Deya-Diaz testified extensively as to his own history

working as a courier, his impressions of the events of May 1, 2008, and about Cordero's behavior

and statements, Deya-Diaz's only substantive testimony about Caraballo-Rodriguez was phrased

in the negative.  When asked whether Caraballo-Rodriguez threw his SIM card out the window,

Deya-Diaz responded that "I don't know if he did anything . . . remember that he was behind

[me]."[150]  When asked whether he knew Caraballo-Rodriguez prior to May 1st, he explained that

he met Caraballo-Rodriguez on that day, and did not know Caraballo-Rodriguez was associated

with the scheme.  In fact, Deya-Diaz testified that until Caraballo-Rodriguez got into the mini-

van, "he didn't know Caraballo-Rodriguez was doing the same thing."[151]  And although Deya-

Diaz testified that he was offered $5,000 to transport the suitcases, he did not testify that

Caraballo-Rodriguez had been offered the same terms.  Indeed, Deya-Diaz's testimony is almost

completely devoid of any reference to Caraballo-Rodriguez—the totality of his testimony

illustrates that Deya-Diaz knew almost nothing about Caraballo-Rodriguez.

The Government argues that Deya-Diaz's testimony about the Defendants' agreement to

fabricate a "cover story" is further proof of Caraballo-Rodriguez's culpability.  However, the

record is exceptionally vague about Caraballo-Rodriguez's role, if any, in fabricating or

deploying that alibi.  Deya-Diaz testified generally that "we" decided to "get some excuse for

being in Philadelphia," but did not explain to what extent—if any—Caraballo-Rodriguez

participated in that discussion.

According to Deya-Diaz's testimony, his knowledge that he was involved in a scheme to

---

[150] Tr. 7/1/09, 39.

[151] Tr. 7/1/09, 37.

import drugs came after many years of acting as a courier.  Deya-Diaz testified that no one ever explicitly told him that the suitcases he was retrieving contained narcotics, but that in 2008, he realized that the suitcases contained drugs when he lifted them from the baggage carousel and noticed that they were abnormally heavy.  He also testified that he never opened or looked inside the locked suitcases.  Deya-Diaz did not, however, testify as to whether the May 1st trip was Caraballo-Rodriguez's first trip or hundredth trip.

In sum, Deya-Diaz's testimony simply establishes that Caraballo-Rodriguez had been instructed to perform the same task for the same individuals.  In order for this testimony to be probative of Caraballo-Rodriguez's knowledge, the jury would have to speculate that Caraballo-Rodriguez's background and experiences were the same or similar to Deya-Diaz's.  But it is improper to infer that they had the same knowledge about the scheme from this alone—"one may not be convicted of conspiracy solely for keeping bad company."[152]  Because, like the co-conspirator testimony in <u>Wexler</u>, Deya-Diaz's testimony does not include " statements . . . made to or about" Caraballo-Rodriguez; it does not alter the calculus of evidence.[153]

2.    *The remaining evidence against Caraballo-Rodriguez*

Disregarding for the moment the expert testimony (about which the Third Circuit has not spoken), the evidence adduced against Caraballo-Rodriguez cannot support a logical inference of knowledge under the Third Circuit's precedent.  Although the Government presented telephone records showing that Deya-Diaz and Caraballo-Rodriguez were in contact with the same person prior to the May 1, 2008 journey, they did not present any evidence of the

---

[152] <u>Cooper</u>, 567 F.2d at 255; <u>Wexler</u>, 838 F.2d at 91.

[153] <u>Id.</u> at 484.

substance of Caraballo-Rodriguez's conversations.[154]  And the Third Circuit has explained that
"Thomas . . . narrowly prohibits jurors from inferring that a defendant gained knowledge of the
subject of an illegal conspiracy based on the existence of a call alone."[155]  It is even
impermissible for the jury to infer, from the fact that a call was made, that the parties actually
spoke.[156]

Even if the jury concluded, based on Deya-Diaz's testimony, that the calls concerned
arrangements for the trip, the Third Circuit has held that it is improper to infer "from the fact and
the timing of . . . calls . . . that [the defendant] knew that drugs were involved."[157]  Further, Deya-
Diaz testified that he never discussed that he would be transporting drugs in the phone calls with
Domi.  Notably, Agent Jennings also testified that together, the three telephone numbers "set off
over twenty DEA cases."  But the Government did not offer testimony from Agent Jennings or
any other witness to itemize or explain which phone numbers set off DEA cases.

As in Wexler, Thomas, Salmon, and Cartwright, the Government failed to introduce any
evidence of a prior relationship between Caraballo-Rodriguez and either Deya-Diaz or Cordero.
In fact, Deya-Diaz testified that he did not know that Caraballo-Rodriguez was associated with

---

[154] Cartwright, 359 F.3d at 288 (evidence of phone contact alone did not demonstrate
knowledge); Thomas, 114 F.3d at 406 (impermissible to draw an inference from the fact and timing of
calls that defendant was told that drugs were the object of the illegal transaction).

[155] Mercado, 610 F.3d at 847–48 (evidence of phone calls between conspirators permissibly
supported an inference of knowledge in combination with co-conspirator's testimony that defendant was
repeatedly present during drug transactions).

[156] Id. at 406.

[157] Thomas, 114 F.3d at 406.

the enterprise until the moment he entered the minivan.[158]  There was also no evidence that

Caraballo-Rodriguez had ever before acted as a courier.

> 3. *Expert Testimony*

At trial, the Government's expert, Agent Basewitz, testified at length about the typical

structure and operation of the "classic San Juan cocaine airport smuggling scheme."[159]  During

that testimony, Basewitz stated that "[C]ouriers . . . are not picked out of the blue, in most

instances . . . . they are trusted individuals . . . they know or should have known its drugs."[160]  If

the jury accepted Basewitz's testimony, it may have concluded that Caraballo-Rodriguez's

actions were the same as those of the typical drug courier, also inferring that because Caraballo-

Rodriguez was a courier, he knew the object of the conspiracy was to smuggle drugs.  Therefore,

the Court must determine whether such evidence is sufficient to show knowledge in this case.

"When a criminal case rests heavily on an expert's opinion, courts should "be cautious in

assessing the sufficiency of a case based heavily on such an opinion."[161]  Upon consideration of

the limited Third Circuit precedent in this area, along with the analyses of other courts, the Court

concludes that Basewitz's conclusory statement about the knowledge of a hypothetical drug

courier does not alter the weight of evidence against Caraballo-Rodriguez.[162]

---

[158] Tr.7/1/09, 34.

[159] Gov't's Notice of Intent to Present Expert Testimony and Statement of Expert's Background and Qualifications at 1 [doc. no. 72].

[160] Tr. 7/2/09, 108.

[161] United States v. Young, 745 F. 2d 733, 765 (2d Cir. 1984) (Newman, J., concurring).

[162] Prior to the trial, the Government filed its Notice of Intent to Present Expert Testimony and Statement of Expert's Background and Qualifications. [doc. no. 72].  In that notice, the Government indicated that Agent Basewitz was expected to testify that "[i]t is fundamental to these schemes that the

Through Basewitz's testimony, the Government presented a typical "drug courier profile"—a "somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics."[163]  Many federal courts have analyzed whether drug courier profile evidence contravenes Rule 704(b) of the Federal Rules of Evidence.  Under that rule:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charge or of a defense thereto.  Such ultimate issues are matters for the trier of fact alone.

The majority of courts have concluded that the testimony is inadmissible as substantive proof of guilt or innocence, but may be admitted for rebuttal or other, non-substantive purposes such as explaining *modus operandi* or describing the background operational principles of a particular type of narcotics operation.[164]  Although the Third Circuit has never directly considered whether expert testimony is appropriate as substantive proof of guilt or evidence, it has concluded that "[e]xpert testimony concerning the *modus operandi* of individuals involved in drug trafficking

---

couriers are typically *not* advised what is contained in the luggage, but are paid very large sums of money for the limited acts of collecting and delivering the drug-laden luggage, in order to ensure that the couriers will complete the delivery of the drugs to the desired parties once they arrive in the continental United States."  Notice of Intent at 2.  At trial, however, Basewitz testified that most couriers *do* typically know the contents of the luggage they are hired to transport.  On cross-examination, Caraballo-Rodriguez's lawyer, Mr. Warren, attempted to use the Notice to impeach Basewitz's testimony by asking Basewitz to explain the discrepancy.  Tr. 7/2/09 at 152–60.  Basewitz claimed that the Government's Notice—which Mr. Warren entered into evidence—did not accurately reflect his opinion, and that he had notified the Government's attorney upon review of the Notice. Tr. 7/2/09 at 152.

[163] <u>Reid v. Georgia</u>, 448 U.S. 438, 440–41 (1980).

[164] For an exhaustive compilation of the cases addressing the admissibility of drug courier profile testimony in criminal prosecutions, see Jay M. Zitter, Annotation, <u>Admissibility of Drug Courier Profile Testimony in Criminal Prosecution</u>, 69 A.L.R. 5th 425 (1999).

does not violate rule 704(b)."[165]  In <u>United States v. Watson</u>,[166] the Third Circuit explained:

> There is . . . a fine line that expert witnesses may not cross.  It is well established that experts may describe, in general and factual terms, the common practices of drug dealers.  Expert testimony is admissible if it merely supports an inference or conclusion that the defendant did or did not have the requisite mens rea, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony.[167]

Although this rule pertains to the admissibility of evidence, it informs the Court's decision.

The Third Circuit has consistently distinguished expert testimony about the general behavior of drug traffickers from expert testimony about a defendant's mental state.  The former category is permissible; the latter is not.  In <u>Watson</u>, the Government's expert violated rule 704(b) by testifying that the defendant, who was intercepted on a bus with one-hundred plastic bags of crack cocaine, "possess[ed] with the intent to distribute to someone else."[168]  The court noted that "narcotics experts may testify about drug dealing, but they are in no way qualified to testify about a defendant's mental condition."[169]  In later cases, the Third Circuit distinguished <u>Watson</u> from cases where the expert offered "no more and no less than a description, in general and factual terms, [of] the common practices of drug dealers."[170]  For instance, in <u>United States v. Price</u>, the expert testified that drug dealers are very likely to carry guns, and drug buyers almost

---

[165] Fed. R. Evid. 704(b);  <u>Watson</u>, 260 F.3d at 309–09 (internal citation omitted).

[166] 260 F.3d 301 (3d Cir. 2001).

[167] <u>Id.</u> at 309.

[168] <u>Id.</u> at 310.

[169] <u>Id.</u>

[170] <u>United States v. Price</u>, 458 F.3d 202, 212 (3d Cir. 2006) (quotation omitted) <u>aff'd</u> 69 F. App'x 46 (3d Cir. 2003).

never do.[171]  Because the testimony focused solely on the typical behavior of drug dealers, and "said not a word about [the defendant's] mental state," the "testimony was entirely legitimate."[172] Similarly, in United States. v. Martin,[173] a district court noted that "[w]here experts 'expressly base[] their opinions on analysis of what might be called the external circumstances of [a defendant's arrest], rather than on any purported knowledge of his actual mental state, there is no violation of Rule 704(b)."[174]

In this case, perhaps the most damning evidence against Caraballo-Rodriguez was Basewitz's testimony that "[C]ouriers . . . are not picked out of the blue, in most instances . . . . they are trusted individuals . . . they know or should have known its drugs."[175]  Although it appears, *a fortiori*, from Idowu, Wexler, and Boria that evidence that a defendant is a "trusted member" of the conspiracy is insufficient to support an inference of "knowledge," none of those cases examined whether expert testimony might alter the weight of that evidence.  On this sufficiency challenge, however, the Curt must determine what inference the jury was permitted to draw from Basewitz's testimony.

In United States v. Gutierrez-Farias[176] the Fifth Circuit considered a challenge to expert testimony that was substantially similar to the testimony in this case.  There, the expert described

---

[171] Id. at 212.

[172] Id.

[173] 186 F. Supp. 2d 553 (E.D. Pa. 2002).

[174] Id. at 561.

[175] Tr. 7/2/09, 108.

[176] Gutierrez-Farias, 294 F.3d at 662.

how couriers are recruited to smuggle drugs:

> The way it usually works in that respect is that I don't think they would target somebody just off the street that, you know, has no knowledge. Usually it's somebody that is a friend of a friend. It could start that way.
>
> Usually they want to use people that are—that can be —have a certain amount of trust and responsibility because you have to realize as we showed before here, the amount of money that the narcotics communicates too. It's a lot of money and, you know, this is, like I said, a business, the people need a certain amount of credentials, if you will, to be employed or to be sought out by a narcotics trafficking organization.[177]

The Fifth Circuit held that the district court erred by admitting the expert's testimony. First, the Court questioned whether the expert's opinion about an individual's likely knowledge could fairly be considered "expert."[178] "Rather than assisting the jury to understand evidence presented or complicated fact issues in the case, [the expert] presented the jury with a simple generalization: In most drug cases, the person hired to transport the drugs knows the drugs are in the vehicle."[179] In the court's view, that statement improperly suggested that "because most drivers know there are drugs in their vehicles, [the defendant] knew."[180] Although the court found that the lower court erred in admitting the testimony, the Court held the error harmless

---

[177] Id. at 662. Compare this testimony to Basewitz's: [C]ouriers . . . are not picked out of the blue, in most instances . . . . They are trusted individuals. The couriers, if you're transporting a significant amount, their addresses or families and information are known to the person who is either coordinating or supplying. . . . And they have to be trusted because of the amounts that they ferry back and forth, both if it's cash, depending on which direction you're heading, or if it's drugs. Tr. 7/2/09, 108. Notably, the Defense did not object to this testimony.

[178] Id. at 663.

[179] Id.

[180] Id. (In the same opinion, the Fifth Circuit considered the sufficiency of the evidence (not including the expert testimony) against the defendant and found that substantial evidence supported the jury's verdict).

because the statements were "only a small portion of an otherwise strong case."[181]

Here, Agent Basewitz testified about the profile of couriers in Puerto Rico, and his belief, based on his own experience, that "they know, or should know that it is drugs." Naturally, if the jury found that Caraballo-Rodriguez shared the typical attributes of couriers, the direct inference from Basewitz's testimony would be that he, like all couriers, knew or should have known that his suitcase contained drugs. But in the absence of any other evidence from which the jury could permissibly draw an inference of knowledge, the court will not permit an expert's conclusory statements about the defendant's mental state to tip the balance: "It is one thing to permit a jury to weigh [expert testimony] in considering an otherwise inadequate case; it is quite another matter to let that opinion salvage an insufficient case."[182]

### 4. Willful Blindness

Even absent circumstantial or direct proof of subjective knowledge, the evidence will suffice if it supports an inference of willful blindness. But nothing in this evidence shows that Caraballo-Rodriguez was "subjectively aware of the high probability of the fact in question," or that he "deliberately . . . avoid[ed] specific knowledge of [the] contents" of the suitcases.[183]

Here, the evidence only shows that Caraballo-Rodriguez knew that he was being entrusted with a large suitcase which could contain—a "wide variety of contraband items . . . including stolen jewelry, laundered money, stolen computer chips, and counterfeiting plates."[184]

---

[181] Id.

[182] Young, 745 F.2d at 766 (Newman, J., concurring).

[183] Smith, 183 Fed. App'x. at 269.

[184] Idowu, 157 F.3d at 268–69.

Unlike in Camino—where the low value of the statue was obvious—there is no direct evidence that Caraballo-Rodriguez knew the value of the suitcases he was being paid to transport was disproportionate to the amount he was being paid. Although Deya-Diaz testified to the amount he was being paid, no evidence established that Caraballo-Rodriguez was promised the same amount.

Further, there is no evidence the Caraballo-Rodriguez had the type of ongoing and continuous relationships with his co-conspirators that would afford him an opportunity to inquire as to the contents of the suitcases. No evidence showed that Caraballo-Rodriguez had made multiple trips as a courier, nor even that he had ever boarded a flight to the United States prior to the May 1, 2008 flight. Finally, the suitcases were locked, and only in Caraballo-Rodriguez's possession for a short time, making it difficult—if not impossible—for him to open the suitcases to examine their contents.

B.     CORDERO

The Government adduced the following evidence against Cordero at trial: Cordero identified the couriers at the Philadelphia airport, although he had never met them before, guided them to the SUV, and showed them where to put the suitcases. He used his own car to transport the couriers from the airport. When he noticed the police were following him, he took evasive measures and attempted to destroy evidence by discarding the SIM card in his phone.[185] And when Deya asked where he would be paid, Cordero informed him that he would receive payment in the Bronx. Further, telephone records showed that Cordero received calls from the Bronx on

---

[185] Cordero's attempt to discard the SIM card did not prevent agents from securing phone records corresponding with that number. Tr. 6/30/09, 149.

May 1, 2008.  Finally, the Government introduced Basewitz's expert testimony, which unlike

that relevant to Caraballo-Rodriguez, was confined to a general description of the typical role of

monitors in Puerto-Rican drug trafficking schemes.

       *1.*     *Co-Conspirator Testimony*

       While Caraballo-Rodriguez was a phantom figure in Deya-Diaz's testimony, Cordero

played a feature role.  Deya-Diaz testified that when he arrived at the luggage carousel, Cordero

approached him, and waited with him for the suitcases.[186]  Once they arrived, Cordero led Deya-

Diaz to the garage.[187]  There, he showed Deya-Diaz where to put the suitcases and which vehicle

to enter.[188]  As they exited the garage, Deya-Diaz "asked him where we were going and who was

going to pay me."  Cordero answered "We're going to the Bronx and you [will] be paid there."[189]

       Deya-Diaz also testified that Cordero "looked through the rear-view mirror and he said to

us there is a patrol car that is following us, that has been following us for a while."[190]  After that,

Cordero directed his passengers to "take the chips off the cell phone," and Deya-Diaz witnessed

him "roll[] down the window and toss[] it out."[191]

       Deya-Diaz's testimony provides the "crucial additional fact" that, in conjunction with the

phone records and surveillance observations, distinguishes the evidence against him from that

---

[186] Tr. 7/1/09, 28.

[187] Tr. 7/1/09, 29.

[188] Tr. 7/1/09, 32.

[189] Tr. 7/1/09, 37.

[190] Tr. 7/1/09, 38, 56.

[191] Tr. 7/1/09, 39.

adduced against Caraballo-Rodriguez.  United States v. Iafelice[192] helps explain this distinction:
There, the "truly distinguishing fact" was the defendant's "ownership and operation" of the
vehicle used to transport the drugs.[193]  Although Cordero never physically exerted control over
the drugs or transported them in his vehicle, Deya-Diaz's testimony shows that Cordero was
leading and directing the couriers from the moment he met them at the airport.  Cordero ferried
the couriers from one location to the next, effectively controlling the suitcases from the moment
they arrived in Philadelphia until they were driven away in the SUV.  And Cordero's comments
regarding the site of payment demonstrated that he knew what would happen when the couriers
arrived at their ultimate destination.  Further, when Cordero spotted a police car tailing his car, he
instigated a variety of measures to elude detection including tossing his SIM card—potentially
containing incriminating information about his contacts—out the window.  This evidence, in
combination with other evidence, supports a permissible inference that Cordero was in a position
of leadership and control in the drug smuggling scheme.  That inference, in turn, could support a
reasonable juror's conclusion that Cordero knew that the object of the scheme was to distribute
narcotics.

　　　　*2.*　　*Phone Contacts*

　　　　Although, as we have explained above, it is impermissible to draw an inference of
knowledge from the mere fact of telephone contacts, the evidence pertaining to Cordero's phone
contacts supports an inference that Cordero had a deeper and more significant role in the drug-

---

[192] 978 F.2d 92 (3d Cir. 1992).

[193] Id. at 97.

trafficking scheme than the couriers.  In <u>United States v. Mercado</u>,[194] the Third Circuit explained the jurors are not precluded from making *any* inferences based on phone records.  Rather, jurors are *narrowly* restricted from inferring that a "defendant gained knowledge of the subject of an illegal conspiracy based on the existence of a call alone."[195]

Here, the fact and timing of phone calls, viewed in the light most favorable to the Government and in connection with Cordero's comments to Deya-Diaz, support an inference that Cordero was deeply involved in the drug-smuggling scheme.  Cordero received a cluster of calls originating in the Bronx around the time the couriers arrived in Philadelphia.  Later, he indicated to Deya-Diaz that he would be paid in the Bronx.  Together, these facts could show that Cordero was coordinating with an individual in the Bronx to whom he intended to deliver the couriers for payment.  That fact, in connection with other evidence of Cordero's direction and control of the couriers, could reasonably indicate that Cordero, unlike Caraballo-Rodriguez, had a preexisting and long-term relationship with drug-smuggling operations.  That is a reasonable basis from which the jury could conclude either that Cordero knew, or if he did not, that he had the opportunity to inquire.

   3.   *Expert Testimony*

From Basewitz's testimony, a reasonable jury could conclude that Cordero was acting as a "monitor" on May 1, 2008.  Unlike his testimony about couriers, which improperly drew conclusions about knowledge, Basewitz confined his testimony about the typical role of a monitor to a description of a monitor's activities in a drug-smuggling scheme:

---

[194] 610 F.3d 841 (3d Cir. 2010).

[195] <u>Id</u>. at 846.

There is somebody from the organization sent to insure that the police haven't interceded, that the person is doing what they're supposed to do and not, for instance, taking the drugs for themselves.  So they're basically observing.  However, the monitor or observer is not somebody who is going to touch the drugs.  It's very difficult to associate them.  Usually, you're watching for observation because they don't want to touch the drugs because that links them to the drugs. . . ..

By and large, the observer is to insure that the drugs have gotten there, the couriers have done their job, and have sent them to the next phase.[196]

From that testimony, the jury could have concluded that Cordero was a "monitor."  That generalized description, in conjunction with the other evidence, showed that the monitor is in a position to direct and control activities within the organization.  They are there to ensure that the scheme unfolds as planned, and to make sure the drugs get to the ultimate destination.  Based on this role, in connection with the other evidence, the jury could properly infer that Cordero knew that the scheme he was monitoring involved narcotics.

### 4.    Summary

Although this is admittedly a close case, we conclude that the Government's evidence against Cordero was sufficient to support the jury's verdict.  Cordero's actions on the day of the drug interdiction, his use of his own vehicle, Deya-Diaz's testimony and the other evidence against him support an inference that Cordero exercised direction and control over the couriers.  That is a sufficient basis from which to draw an inference of specific knowledge or deliberate ignorance.

## V. Conclusion

---

[196] Tr. 7/2/09, 101–103.

For the reasons set forth above, Caraballo-Rodriguez's Motion for Judgment of Acquittal is granted and Cordero's Motion for Judgment of Acquittal is denied.  A corresponding order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| v. | : | |
| **JUAN CORDERO,** | : | No.   **08-328-1** |
| Defendant. | : | |
| | : | |
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| v. | : | |
| **JOSE CARABALLO-RODRIGUEZ** | : | No.   **08-328-2** |
| Defendant. | : | |

## ORDER

**AND NOW**, this 6th day of September 2011, it is hereby **ORDERED**:

1)      Defendant Juan Cordero's Motion for Judgment of Acquittal is **DENIED**.

Sentencing will be set by separate order.

2)      Defendant Jose Caraballo-Rodriguez's Motion for Judgment of Acquittal is

**GRANTED**.   The Clerk of Court will enter a **JUDGMENT OF ACQUITTAL**

for Caraballo-Rodriguez with respect to all Counts of the Indictment in this

Action.

It is so **ORDERED**.

BY THE COURT:

_____
**HON. CYNTHIA M. RUFE**